IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES<br><br>    Plaintiff,<br><br>v.<br><br>TAFFARI J. MARIQUE<br><br>    Defendant. | Crim. No. **22-00467-PJM** |

MEMORANDUM OPINION

Taffari J. Marique ("Marique") appeals his conviction by a Magistrate Judge for possessing a firearm on government property in violation of 45 C.F.R. § 3.42(g). Having considered the parties' arguments, no hearing being necessary, the Court **AFFIRMS** the conviction.

### I.     FACTUAL AND PROCEDURAL HISTORY

On the morning of June 21, 2021, Marique drove to the National Institutes of Health (NIH) campus in Bethesda, Maryland to perform work as a contractor. When he arrived, he reported to the commercial vehicle inspection checkpoint where a security guard performed a routine search of his vehicle. The security guard found a handgun in Marique's glove compartment as well as a magazine and ammunition in the car's center console. An officer with the NIH police force then seized the handgun, magazine, and ammunition from the car, and took Marique into custody. At NIH police headquarters Marique was given a citation for violating 45 C.F.R. § 3.42(g), which, in pertinent part, states:

> No person other than a specifically authorized police officer shall possess firearms, explosives, or other deadly weapons or dangerous materials intended to be used as weapons either openly or concealed [on the NIH campus].

1

45 C.F.R. § 3.42(g).

Marique filed a Motion to Dismiss the citation, arguing that § 3.42(g) is unconstitutional under the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). In *Bruen*, the Supreme Court announced a new framework for interpreting the Second Amendment and determining the constitutionality of restrictions on the right to use and carry firearms in public. In a Memorandum Opinion signed on December 14, 2022, Magistrate Judge Quereshi denied Marique's Motion to Dismiss, concluding that § 3.42(g) is a constitutionally permissible regulation of firearms under the *Bruen* framework. Thereafter, on December 20, 2022, at a bench trial, the Magistrate Judge found Marique guilty of violating § 3.42(g). Marique filed the instant appeal on December 30, 2022.

## II. LEGAL STANDARD

Pursuant to Fed. R. Crim P. 58(g)(2)(B), "[a] defendant may appeal a magistrate judge's judgment of conviction or sentence to a district judge within 14 days of its entry." For an appeal of this nature, "[t]he scope of the appeal is the same as in an appeal to the court of appeals from a judgment entered by a district judge." Fed. R. Crim. P. 58(g)(2)(D). Appellate courts review constitutional claims as to criminal convictions de novo. *United States v. Collins*, 982 F.3d 236, 243 (4th Cir. 2020) (reviewing lower court decision rejecting Second Amendment challenge to 18 U.S.C. § 922(g)(4) under de novo standard of review). On de novo review, the appellate court can affirm the judgment for any reason in the record, even if not the same reason relied on by the lower court. *United States v. Swann*, 149 F.3d 271, 277 (4th Cir. 1998).

## III. DISCUSSION

### a. Legal Standard as Articulated in *Bruen*

Marique challenges the constitutionality of § 3.42(g) both on its face and as applied to him, arguing that the law infringes on conduct protected by the Second Amendment. The Second

2

Amendment states, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

In *Bruen*, the Supreme Court abrogated the means-end balancing test historically used by courts to determine the constitutionality of laws in the Second Amendment context. *Bruen*, 142 S. Ct. at 2127. Instead, the Court created a new two-prong framework, instructing lower courts to focus on the history of firearms regulation. *Id.* at 2129–30. First, courts are directed to ask whether the statute prohibits conduct that is covered by the Second Amendment's plain text. *Id.* If an individual's conduct is deemed to be covered by the plain text, it is presumptively protected by the Constitution. *Id.* Second, to overcome the presumption of constitutionality, the government bears the burden of demonstrating that the regulation is consistent with the Nation's historical tradition of firearm regulation. *Id.* at 2130. Only if the government demonstrates a sufficient connection between the modern regulation and historical regulations may a court conclude that the conduct is not protected by the Second Amendment. *Id.*

As to *Bruen*'s first prong, courts evaluate whether the individual's conduct is covered by the Second Amendment's text as informed by history. *Id.* at 2127. As to *Bruen*'s second prong, the question is whether a regulation is consistent with the Nation's historical tradition of firearms regulation, that is, a tradition which existed in 1791 when the Second Amendment was ratified. *Id.* at 2136. When evaluating evidence of a historical tradition of firearms regulation, *Bruen* instructs courts to use different tests depending on the kind of problem a regulation addresses. Where a regulation "addresses a general societal problem that has persisted since the 18th century," the government must point to a tradition of "distinctly similar historical regulation[s]" when defending the statute. *Id.* at 2131. Conversely, if a modern statute is aimed at "unprecedented societal concerns or dramatic technological changes" not present at the founding, courts are

directed to ask whether the modern statute and historical precursors are "relevantly similar" rather than "distinctly similar." *Id.* at 2131–32. In determining whether a modern statute is relevantly similar to historical regulations, courts are directed to assess "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether the burden is comparably justified." *Id.* at 2133. While the government does not need to identify a "historical twin," "courts" 'should not uphold every modern law that remotely resembles a historical analogue,' because doing so 'risk[s] endorsing outliers that our ancestors would never have accepted.'" *Id.*

Additionally, the Supreme Court in *Bruen* emphasized and incorporated certain familiar paths to regulating weapons under the new framework. Specifically, it affirmed the use of the "sensitive places" doctrine, as originally articulated in *District of Colombia v. Heller*, 554 U.S. 570 (2008). *See id.*; *see also Heller*, 554 U.S. at 626 ("[N]othing in our opinion should be taken to cast doubt on longstanding…laws forbidding the carrying of firearms in sensitive places such as schools and government buildings."). The Court reaffirmed the validity of such laws in *Bruen* because, "[a]lthough the historical record yields relatively few 18th- and 19th- century 'sensitive places' where weapons were altogether prohibited—*e.g.*, legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions." *Bruen*, 142 S. Ct. at 2133. As Magistrate Judge Quereshi stated earlier in this case,

> *Bruen* called for courts going forward to use analogical reasoning to places beyond schools and government buildings, resulting in an expansive, but not limitless interpretation of what a sensitive place could be. Accordingly, while the Court rejected New York's argument that all places of public congregation could be considered sensitive places, the Court encouraged lower courts to "use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." [142 S. Ct. at 2133]. Notably, the Court declined to "comprehensively define" sensitive places, only saying that New York had gone too far. *Id.* at 2133-34.

*United States v. Marique*, No. 8:21-po-02263-AAQ, 2022 WL 17822443 at *2 (D. Md. Dec. 20, 2022). As such, the express endorsement of the sensitive places doctrine in *Bruen* suggests that regulations of firearms in schools, government buildings, and other new and analogous places are presumptively permissible.

**b.      Marique's Argument that § 3.42(g) Fails to Satisfy the Test Established in *Bruen***

Marique argues that § 3.42(g) is unconstitutional because it fails to pass the two-prong test established in *Bruen*. As to step one of the two-prong *Bruen* test, he argues that his conduct is covered by the Second Amendment's plain text, which he says protects the right of (1) "the people" to (2) "keep and bear" (3) "Arms." U.S. Const. amend. II. Marique asserts that he is undoubtedly among "the people" whom the Second Amendment protects and that the handgun in his possession is unambiguously an "arm" for Second Amendment purposes. *See Heller*, 554 U.S. at 629 (explaining that "the people" refers to all members of the political community and that a handgun is an arm). Likewise, Marique submits that his conduct amounts to "bearing," since, as *Bruen* articulates, the right to "bear" arms "naturally encompasses public carry," meaning places outside the home (such as the NIH campus). *See Bruen*, 142 S. Ct. at 2134.

Under step two of the *Bruen* test, Marique argues that § 3.42(g) is inconsistent with the Nation's historical tradition of firearms regulation. He asserts that the "general societal problem" that § 3.42 is meant to address—the threat of violence disrupting governmental function—has persisted since the 18th century, meaning the government must show a historical tradition of "distinctly similar" regulations. ECF No. 6 at 17. Marique says the Government failed to make this showing and even if it had, the Government still failed to carry its burden because the sensitive places doctrine articulated in *Bruen* only permits bans on firearms in a narrow set of government buildings, namely: "legislative assemblies, polling places, and courthouses," and "new and analogous" locations. ECF No. 6 at 16. Under Marique's reading of *Bruen*, the NIH campus does

5

not fall in any of these specific categories and, therefore, § 3.42(g) cannot be justified under the sensitive places doctrine.

### c. The Government's Argument that § 3.42(g) does not Violate the Second Amendment

The Government advances two arguments supporting the constitutionality of § 3.42(g). First, it contends that Marique's Second Amendment claim fails because under the Property Clause of the Constitution, the government has plenary power to set the rules for its own property. *See* U.S. Const. art. IV, § 3, cl. 2.[1] However, neither the Magistrate Judge, nor does this Court find this argument persuasive. *See Marique*, 2022 WL 17822443 at *4 (explaining that the Government's plenary powers argument overstated its position as there is no case law supporting the proposition that the government can ignore outright constitutional protections on its own property).

Alternatively, the Government asserts that Marique's conviction should be upheld because § 3.42(g) satisfies the test established in *Bruen* and is therefore constitutional. According to the Government, his conduct is not covered by the plain text of the Second Amendment and thus fails to meet the first step of the *Bruen* framework. While the Government acknowledges that *Bruen* correctly acknowledges the constitutional right of individuals to carry a firearm for self-protection in the general public, the Government argues that the NIH campus is not the general public. Rather, NIH is a "highly regulated, closely-scrutinized, heavily guarded government research facility," where there is no presumptive right for individuals to carry weapons. ECF No. 12 at 10. Accordingly, the Government contends that Marique's conduct was not protected by the Second Amendment and that he was properly convicted for bringing a firearm onto the NIH campus.

However, even if Marique's conduct is presumptively protected by the Second Amendment, the Government submits that his conviction should still be upheld because § 3.42(g)

---

[1] "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const., art. IV, § 3, cl. 2.

6

is entirely consistent with the types of regulations Congress has imposed for "sensitive places" since the Founding Era. *Id.* And, again, in both *Heller* and *Bruen* the Supreme Court recognized that firearms prohibitions in government buildings were presumptively legal because buildings where government functions take place are considered sensitive places. The Government notes that although the Court in *Bruen* provided three specific examples of government buildings considered to be sensitive places, that list was preceded by an "e.g.," (meaning "for example") followed by a general expansive phrase "new and analogous places" after the list of examples, clearly implying the few examples listed were not a closed set. *Id.* at 14. The Government continues. Because the NIH campus is a facility entirely controlled by the Government where government operations take place, it is clearly covered by the sensitive places doctrine. Accordingly, § 3.42(g) is constitutional and Marique's conviction must be upheld.

**d.      Analysis**

Having reviewed the arguments of both parties, the Court finds § 3.42(g) constitutional and that Marique's conviction must be upheld.

### i.      First Prong of *Bruen* Analysis

To repeat:

Under *Bruen*, the first step in determining if a regulation of firearms is permitted under the Second Amendment is to determine whether the plain text of the Second Amendment covers the conduct at issue. 142 S. Ct. at 2135. In *Bruen*, the Supreme Court held that the Second Amendment "guarantees a general right to public carry [firearms]." *Id.* As defined in *Heller*, *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010), and *Bruen*, public carry was generally understood to mean any place outside the home subject to restrictions consistent with the Nation's well-established historical traditions (second prong of *Bruen* analysis). *Bruen*, 142 S. Ct. at 2135. As such, there is nothing in the plain text of the Second Amendment to suggest a distinction

7

between the general public and federal property such as the NIH campus, even if that federal property is a secured research facility. The Court thus proceeds to the second prong of the *Bruen* analysis.

### ii. Second Prong of *Bruen* Analysis

Because the plain text of the Second Amendment does not prohibit Marique's conduct, the Government bears the burden of showing that § 3.42(g) is consistent with the Nation's historical regulation of firearms in order to defeat the presumption that the statute is unconstitutional. Although the Court conducts its own review of *Bruen*'s discussion of the sensitive places doctrine, it finds particularly persuasive Magistrate Judge Quereshi's analysis as well as that of Magistrate Judge Simms in *United States v. Robertson*, No. 22-po-867-GLS, 2023 WL 131051 (D. Md. Jan. 9, 2023), a case concerning a set of factual circumstances nearly identical to the case at hand. The Court adopts Judge Simms' reading of *Bruen* in the present case. *See Robertson*, 2023 WL 131051 at *7

> ("In sum, this Court reads *Bruen* as holding that: (1) schools and government buildings are examples of sensitive places, not the exhaustive list of what sensitive places are; (2) there are only a few Eighteenth- and Nineteenth-Century regulations that altogether prohibited weapons in sensitive places, which are also defined to include legislative assemblies, polling places, and courthouses; (3) banning weapons in sensitive places has a longstanding historical pedigree, which does not violate or run afoul of the Second Amendment; and (4) when necessary, the Court may use analogical reasoning to identify new sensitive places.").

The Court therefore holds, consistent with *Bruen* that government buildings are sensitive places where firearms regulations are presumptively permissible. With that understanding, the Court considers whether the NIH is a sensitive place and concludes that it is.

NIH is undoubtedly a government facility. It consists of 21 different institutes, all dedicated to some form of biomedical research, operating under the Department of Health and Human Services. Because the research taking place at NIH often involves the use of hazardous materials such as pathogens, infectious diseases, human biological materials, and small amounts

8

of nuclear material, the NIH campus has every reason to be highly secured and closed to the public at large. All visitors and employees of NIH must enter through an inspection point guarded by NIH police officers and is only open at certain times of the day. Upon entry, all individuals are asked to submit to a personal or vehicle inspection and must provide a form of government-issued identification. Once on campus, employees and visitors are required to wear identification credentials prominently at all times. And while NIH is a nearly 300-acre campus, the security measures in place create an environment akin to the four walls of any other highly secured government building.

In *Bruen* and in *Heller*, the Supreme Court made no distinction between the types of government buildings that are sensitive places. The Court declared only that government buildings are sensitive places where firearms regulations are presumptively permissible and consistent with the Nation's history of firearms regulations. NIH is unquestionably a government facility consisting entirely of government buildings.

Not only is NIH a location containing highly hazardous and sensitive research material; it necessitates a level of security comparable to those places specifically listed in *Bruen* as examples of places where firearms have been historically regulated. As in a legislative assembly or a courthouse, members of the public and employees may only enter NIH through limited, guarded entry points, are required to submit to security screening upon entry, and may only enter and remain on campus at the discretion of security officials and the NIH Director. Thus, even were the Court to read *Bruen* as narrowly as Marique asks it to do, NIH would still be a sensitive place because it is analogous in its level of security and limited access to legislative assemblies and courthouses, and indeed, even more secure than polling places—the three specific examples of historical sensitive places cited in *Bruen*. *See Bruen*, 142 S. Ct. at 2133. Given the clear language

9

of *Bruen* and the care taken by the Supreme Court to preserve the government's ability to regulate firearms in sensitive places, there can be no question that the government can prohibit individuals like Marique from carrying firearms onto the NIH campus. The Court holds that § 3.42(g) does not violate the Second Amendment. Marique's conviction is upheld.

## IV. CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant Marique's Appeal of Magistrate Judge Decision and **AFFIRMS** his conviction under 45 C.F.R. § 3.42(g).

A Separate Order will **ISSUE**.

August 17, 2023

PETER J. MESSITTE
U.S. DISTRICT JUDGE